22 So.3d 213 (2009)
STATE of Louisiana
v.
Richard B. PORTIE.
No. 2008-KA-1580.
Court of Appeal of Louisiana, Fourth Circuit.
September 16, 2009.
*214 James D. "Buddy" Caldwell, Attorney General State of Louisiana, Charles J. Ballay, District Attorney of Plaquemines Parish, Michael D. Clement, Assistant District Attorney of Plaquemines Parish, Belle Chasse, LA, for State of Louisiana.
Blaine M. Hebert, Hebert Law Firm LLC, Marrero, LA, for Defendant/Appellant.
(Court composed of Judge JAMES F. McKAY III, Judge ROLAND L. BELSOME, Judge PAUL A. BONIN).
JAMES F. McKAY III, Judge.

STATEMENT OF THE CASE
The defendant, Richard B. Portie, was charged by bill information on October 18, 2007, with theft of property valued at "over" five hundred ($500.00) dollars, a violation of La. R.S. 14:67(B)(1).[1] The defendant pleaded not guilty at his November 19, 2007 arraignment. He was tried by a six-person jury on April 1-2, 2008, and found guilty of attempted theft of *215 property valued at five hundred ($500.00) dollars or more.
On May 21, 2008, the trial court sentenced the defendant to one year in Parish Prison, suspended pursuant to La. C. Cr. P. art. 894; two years misdemeanor active probation, with one hundred hours community service. The trial court also ordered as a condition of his probation that the defendant pay restitution to the victim in the amount of the victim's insurance deductible, two thousand five hundred dollars($2,500.00), through the District Attorney's Office, with the balance of the restitution, thirty-six thousand, fifty-three dollars and ninety-one cents ($36,053.91) to be paid to the victim's insurer. On October 21, 2008, the trial court denied the defendant's motion to reconsider sentence. The trial court cited to La. C. Cr. P. art. 895.1 as its authority to impose restitution as a condition of probation.

FACTS
The defendant was convicted of the attempted theft of a marine outboard motor valued at seventeen thousand one hundred fifty ($17,150.00) dollars.
Plaquemines Parish Sheriffs Deputy Sydney Smith testified that on August 25, 2007, he received a dispatch call of a possible theft of a 250 Suzuki outboard motor from a docking area by three men who placed the motor into a black Ford F-150 pickup truck. Mr. Hewitt, the reporting witness, gave the license plate number to the sheriffs office. The plate was registered to the defendant.
Deputy Smith drove to the defendant's residence in Boothville, on Clarence Lane and Highway 23; another deputy followed. Both deputies made U-turns across the median of Highway 23 and parked on the shoulder in view of the defendant's residence at 164 Clarence Lane. Deputy Smith observed the defendant, who was related by marriage to Deputy Smith's wife and who the deputy knew as "Blake," in a blue F-150 pickup truck parked on the opposite side of the highway. There were two other individuals in the vehicle with the defendant. The defendant crossed the highway. Deputy Smith asked him to tell him what was going on, and the defendant said that someone he knew had paid him fifty dollars to help him pick up and transport a 250 Suzuki boat motor to some place.
Deputy Smith asked the defendant to take him to the location where he dropped off the boat motor. They drove in their own vehicles to the Empire area, where the defendant pointed out a location. Deputy Smith said he exited his patrol car and looked around, but did not see the boat motor. He observed that the ground had not been disturbed. He spoke to a nearby resident, Mr. Moliere, who informed the deputy that between 7:00 and 7:30 a.m. on that day, August 25, 2007, he observed an F-150 pickup truck pick up two white males drive off. Approximately one-half hour later the witness observed the two men being dropped off. Those two men then left in a car. The witness said he had not seen any type of equipment picked up or dropped off at the location where the defendant said he had left the boat motor.
Deputy Smith spoke with Larry Aleman later that same date, August 25, 2007. Aleman was the boat, captain of what he said was C & M Marine, the company that owned the vessel from which the motor in question had been stolen. Deputy Smith identified documents later faxed to the sheriffs office, one of which was a report by the U.S. Coast Guard reflecting that the boat in question was stolen, and a copy of an invoice detailing C & M Marine's purchase of two 2004 Suzuki 250 outboard motors and listing the serial numbers of the motors. Deputy Smith testified that the vessel in question was eventually recovered, *216 with one of its two outboard motors missing.
Deputy Smith testified on cross examination that the original dispatch call concerning the possible stolen boat motor came out at 1:56 p.m. on August 25, 2007. The deputy admitted that he knew the defendant's brother, who is employed by the Plaquemines Parish Sheriffs Office, but testified that since he only knew the defendant by the name "Blake," he did not know at the time of his initial investigation that the defendant was the brother of a fellow sheriffs office employee. Deputy Smith said the defendant signed a written statement that he helped Andrew Daigle and another unknown male load up the boat motor. The matter was turned over to detectives because the value of the stolen item was more than five hundred dollars.
Roger Moliere testified that on August 25, 2007, a deputy came to his residence and told him authorities got a motor out of his yard. Moliere said that earlier that morning he observed a green F-150 pickup truck pull up on the highway near his residence. He saw two white males jump into the truck before it drove away. The truck returned approximately twenty minutes later. Two white males jumped out, got into a car, and both the truck and the car drove off. Moliere said he could not identify the two white males who jumped out of the truck and got into the car as the same two white males he observed get into the truck twenty minutes earlier. Moliere knew Andrew Daigle as an acquaintance, but could not say Daigle was one of the white males who got into the truck. Moliere said he never saw anyone put a motor in his front yard.
Moliere, who said he was an oyster fisherman, testified on cross examination that he did not know the defendant. He admitted that he socialized with Andrew Daigle, and he had been friends with Nortel "Dookie" Williams for years. Moliere admitted that in fact Williams lived in Moliere's FEMA trailer, which was located on Moliere's property where his residence was also located. Moliere said he did not see Williams at all on the day of August 25, 2007.
Chad Daigle testified that he was the owner of C & M Contractors, doing business as C & M Boat Rentals. In August 2007 he was employed by C & M Contractors as its operations manager. His duties at that time included scheduling work and captains for the motor vessel ST. JUDE, a thirty-five foot aluminum work boat. At that time, the ST. JUDE was working for Shell on its pipeline in Nairn and was being captained by Larry Aleman. Chad Daigle said that Andrew Daigleno relation that he knew ofhad also been a captain for C & M, but not for the ST. JUDE. He said Andrew Daigle was not employed by C & M on August 25, 2007. Chad Daigle was shown four photographs of the ST. JUDE, with one of its two motors missing. Chad Daigle said he hired Sea Tow to tow the St. JUDE back to the C & M dock in Lafitte. Chad Daigle identified an invoice for the purchase of the missing motor and its twin. He also identified an invoice for the purchase of the replacement motor, which was in the amount of seventeen thousand one hundred fifty ($17,150.00) dollars.
Chad Daigle testified on cross examination that Andrew Daigle was released from C & M's employment in early August 2007 because he was not dependable. He confirmed on redirect examination that he did not authorize Andrew Daigle or anyone else to remove the motor from the ST. JUDE.
Alvin Gros confirmed during his testimony on direct examination that he was the owner of C & M Boat Rental on August *217 25, 2007. On that date he received a call from one of his captains, Larry Aleman, who notified him that the ST. JUDE was missing. Gros did not authorize Andrew Daigle to remove the vessel from where it was tied up. He said it cost approximately seventeen thousand ($17,000.00) dollars to replace the stolen motor.
Larry Aleman testified that he had left the ST. JUDE tied up at a dock in Venice and received notification on August 25, 2007, the next day, that it was not there. The following day, the vessel was recovered by the Coast Guard floating in the Mississippi River. Aleman did not know Andrew Daigle. He did not authorize anyone to move the boat from where it was docked or to remove a motor from it.
Christopher Wade Hewitt testified that on August 25, 2007, he went fishing on the Mississippi River bank at approximately 8:30 or 9:00 a.m. with his two children, his brother and his father. He noticed what he described as a brand new outboard motor, half in the water and half out. He said it was obvious that it had been stolen because all the wires had been cut off, and there was an oil slick on the water from the oil and fluids leaking out. No one else was at that particular location, and he saw no boat in the vicinity. While they were fishing, a green Ford truck with two white males and a black male pulled up. All three got out. Then the smaller white male with tattoos turned the truck around and backed it up. Two of the men pulled the motor up, and all three heaved it into the back of the truck and drove off. He wrote down the license plate number of the truck. Hewitt said he later heard sheriffs deputies mentioning defendant's name, and he realized that he had known the defendant when the defendant was a small child. Hewitt had gone to school with the defendant's brothers. Hewitt recalled that the outboard motor was a black two hundred fifty horsepower Suzuki.
Hewitt stated on cross examination that he did not call the sheriffs office until he got back to his brother's FEMA trailer, and he confirmed that this would have been after 12:00 p.m. He said when the three men left with the motor they went up the levee on a road angled in the direction of Port Sulphur.
Andrew Daigle testified that he was then residing in the Phelps Correctional Center located in DeQuincy, Louisiana, after having been convicted of the theft of the outboard Suzuki motor at issue in the instant case. He was a former boat captain for C & M Boat Rentals and knew its boat was docked at the Omni dock in Venice because his brother worked for the company. Andrew Daigle testified that at one time he had twin outboard motors for sale. On the Friday before the theft, he was with his brother when he encountered the defendant. The defendant asked if he still had the motors for sale, and Daigle replied that he did. In fact, he did not. He previously had sold his motors. Daigle's brother later dropped him off at the Den Lounge in Venice. Sometime after midnight, Daigle walked to the Omni dock and took the boat, which had the key in the ignition, to Nairn. He parked the boat in the Mississippi River, across the levee from where Nortel "Dookie" Williams lived. Williams lived about one half mile from Daigle's trailer. Daigle went to Williams' residence, where he found Williams sitting outside. It was 2:00 or 3:00 a.m. by that time. Daigle borrowed some tools from Williams. He cut the throttle key with bolt cutters. He needed some more tools to remove the motor, so Williams sold him some. Daigle said Williams did not know what Daigle was doing. Daigle removed four bolts securing the motor to the boat and the motor more *218 or less fell off right at the river bank, on some rocks. He pushed the boat out into the river and went to Williams' house.
Daigle said he telephoned defendant around 7:30 a.m. and asked the defendant if he still wanted to buy the motor. The defendant picked up Daigle and Williams, with Daigle explaining Williams' presence by telling the defendant they needed three people to handle the motor. Daigle directed the defendant to where the motor was located. Daigle said the defendant did not know the motor was stolen. Daigle said he was selling it to the defendant for fifteen hundred ($1,500.00) dollars. Daigle said it was not unusual to drop an outboard motor on the river bank, explaining that one could not remove a motor from a boat at, for example, a dock, because there would be no place for the motor to fallit would fall into the water. Nevertheless, Daigle at first conceded that buying a motor sitting on the river bank with cut cables would make him suspicious, but then backtracked and said "it depends." But, he also stated that fishermen sell motors all the time for less than they paid for them, and he mentioned that a rebuilt fifteen thousand ($15,000.00) dollar motor could sell for three or four thousand ($3,000.00 or $4,000.00) dollars.
Daigle admitted having prior convictions for possession of cocaine and aggravated flight, and what he referred to as "probably a couple of more." He pleaded guilty to theft of the outboard motor in the instant case and received consecutive sentences of five years on the theft charge and two years on a probation revocation for the cocaine and flight convictions. Daigle said he did not receive leniency in exchange for his testimony. Daigle denied ever having told Detective Harvey that defendant knew the motors were stolen. When confronted with his recorded statement to Detective Harvey wherein he had stated that the defendant knew the motor was stolen, Daigle said he did not remember stating that. He noted that he had been up for four days straight and was on drugs at the time he gave the statement. He maintained that defendant did not know the motors were stolen, and he said he did not think the defendant would have purchased it if he had known it was stolen. Daigle admitted that the defendant had wanted twin motors, and that when the defendant got this one he said he still wanted the other one. But then Daigle backtracked on that statement, saying he did not recall whether the defendant still wanted the second motor.
On cross examination, the twenty-two-year-old Andrew Daigle admitted to a prior conviction for domestic abuse battery and did not dispute that he had pleaded guilty to twelve misdemeanor and other offenses. Daigle recalled that he paid Nortel Williams two or three hundred ($200.00 or $300.00) dollars for the tools he used to unhook the boat motor, but maintained that Nortel did not know the motor was stolen. Daigle admitted that he initially lied to authorities when he told them that he threw the radar, tracker and any other electronics he removed from the ST. JUDE in the river. He had hidden them in Williams' trailer. Daigle denied that he simply paid the defendant fifty-five ($55.00) dollars to help move the motor. He said on redirect examination that defendant dropped him and Williams off at Williams' trailer, and that the defendant drove off with the motor in his truck.
Nortel Williams testified that he pleaded guilty to the theft of the outboard motor and was then in Belle Chasse lockup. He admitted to lending Andrew Daigle some tools, selling him some tools for five hundred ($500.00) dollars, and helping Daigle and the defendant load the motor into defendant's truck. Williams got the money *219 when Daigle and the defendant dropped him off back at his trailer. Williams testified that he saw the defendant give Daigle money, what was supposed to have been fifteen hundred ($1,500.00) dollars.
Williams admitted on cross examination to thirteen misdemeanor convictions and five felony convictions, including the one for theft in the instant case, for which he was serving a sentence of two years. Williams said Roger Moliere woke him up on the day he helped load the boat motor into the defendant's truck. He admitted that Andrew Daigle told him the motor was stolen, but only after they went to get it. Williams admitted lying when questioned by Det. Patrick Harvey on August 30, 2007. He denied that they dropped off the motor at his trailer. Williams admitted to being a user of crack cocaine. He admitted that Andrew Daigle told him he had committed numerous thefts of outboard motors. He confirmed that Daigle was wired up on cocaine the morning he helped him load the motor into defendant's truck.
Plaquemines Parish Sheriffs Office Detective Patrick Allen Harvey stated that he began investigating the theft on August 25, 2007. The ST. JUDE was recovered the following day in the Mississippi River, missing one outboard motor and some electronic equipment. He spoke to the defendant over the telephone that day. The defendant told him Andrew Daigle had given him fifty ($50.00) dollars to help him move the motor, and he dropped off the motor and Daigle and Nortel Williams at 32072 Highway 11 in Nairn. The detective subsequently took a recorded statement from the defendant. The defendant stuck with his story that Daigle gave him fifty ($50.00) dollars to help pick up and transport the motor. Detective Harvey also subsequently took statements form Daigle and Williams. The motor was never found.
Detective Harvey confirmed on cross examination that Andrew Daigle and Nortel Williams lied to him numerous times. He conceded that it was possible the two also lied when stating that defendant drove off with the motor in his truck. He admitted that the defendant turned himself in to authorities after a warrant was issued for his arrest. Detective Harvey confirmed that defendant's father was a "cop," as was one of defendant's brothers. Detective Harvey confirmed on redirect examination that he did not observe any evidence of a two hundred and' fifty horsepower outboard motor having been left on the ground on Mr. Moliere's property in Nairn where defendant said he had left it. He also noted that Deputy Smith also examined that site and found no such evidence.
The defendant Richard Blake Portie testified that he was then living with his in-laws in Gonzales and working in Venice, Louisiana, for U.S. Liquids. He confirmed that he had been gainfully employed since 1995. He graduated from high school and had one year of college. On Friday, August 24, 2007, he was staying in his trailer in Venice. He went to the Den Lounge. He was standing outside talking to his wife on his cell phone when Andrew Daigle, whom he had not seen since Hurricane Katrina, came walking up. The defendant said he met Andrew Daigle through Daigle's brother, whom he knew through his work. _ At the Den Lounge Daigle asked the defendant if he could help him move a motor and said he would give the defendant a few dollars. The defendant agreed. The next morning Daigle called him at about 7:00 or 8:00 a.m. He picked Daigle and Nortel Williams up. Daigle directed him to where the motor was. The defendant said, without elaborating very much, that he had a funny feeling being directed *220 over the levee, because he had some money in his truck. But, on the other side there were two vehicles parked and some people fishing. Daigle asked one of people if he could move his truck so they could get to the motor. They loaded the motor onto the defendant's truck.
The defendant said Daigle directed him to a place near a green car that the defendant said he had seen following behind his truck that morning, moments before he first saw Daigle and Williams suddenly appear by the side of the road. There was a water faucet at that location, and they unloaded the motor near it. The defendant got back in his truck. Daigle handed him fifty ($50.00) dollars and shook his hand, and the defendant left the scene and returned to Venice. The defendant said a few hours later his brother, the deputy sheriff, who was working a private detail, called him and began cursing him out, wanting to know what he was doing with a stolen outboard motor. The defendant said he told his brother he did not know anything about a stolen motor. He asked his brother who was working that day, meaning what patrol deputies, and was told Deputy Smith and Deputy Turner. The defendant said he began looking out for the deputies and saw them. He said he had an older man in his truck with him, Manuel Taylor, when the deputies pulled up. He told his story and took the deputies to where he dropped off the motor. He was told a detective would be contacting him, and he was allowed to go. Detective Harvey contacted him a couple of days later and he came to the station and gave him a statement. Detective Harvey had not yet talked to Andrew Daigle.
The defendant testified Detective Harvey contacted him after Daigle was arrested. Defendant turned himself in to authorities on a Sunday. Before he went to court for his initial appearance Detective Harvey came to talk to him, asking where the motor was. The defendant said he reiterated to Detective Harvey that all he did was transport the motor from point A to point B. Detective Harvey told the defendant that Nortel Williams and Andrew Daigle told him that the defendant had the motor, with the detective noting that Williams' and Daigle's story had changed three or four times.
The defendant denied that he knew the motor was stolen. The defendant said if he knew the motor was stolen he would not have gone there to pick it up in his own vehicle in front of eight people fishing there. He said he would not have gone in the first place if he knew it was stolen. The defendant said he had seen Nortel Williams by face, that Nortel lived across the street from a friend of his, but that he had never spoken with him. The defendant replied in the affirmative when his counsel asked whether he had used poor judgment.
The defendant indicated on cross examination that he did not know Andrew Daigle very well. He denied seeing Daigle on the road the day before the he went to pick up the motor, as Daigle had testified. He said he saw Daigle at the Den Lounge around 1:00, 2:00 or 3:00 a.m. They had a conversation lasting no more than five minutes. The defendant said that if he needed to purchase an outboard motor he would go to Duvic's, which sells outboard motors, or a boatyard. He would not call C & M Boats. He said he had purchased a boat and motor once before, in 1992 or 1993, the motor from a woman, the boat from her son. The motor was on the ground at the trailer park where the woman lived. The motor did not have things cut off of it. He got registration papers for the boat and motor.
The defendant said that when Andrew Daigle directed him to drive over the levee *221 on the morning they were going to get the motor, he had a funny feeling like Daigle and Nortel were going to do something to him. The defendant said he was not suspicious when he picked up Daigle and Nortel Williams. The defendant said the Andrew Daigle he knew seemed like a good guy. When asked by the prosecutor if he agreed that outboard motors are not ordinarily found lying on the river batture, the defendant noted that a long time ago a friend of his had to cut his motor off and drop it on the bank because his boat was taking on water. The defendant said this was not uncommon. The defendant testified that he did not question Andrew Daigle in detail as to how the motor came to be there. The defendant stated that he did not even know beforehand what type of motor Daigle needed help in movinga car motor, an outboard motor, etc. The defendant said he did not know beforehand whether the motor Daigle needed help with was on a trailer, on the ground, etc. The defendant was confronted with a video of his recorded statement to Det. Harvey, wherein he stated, as to the motor's throttle control cables that "they cut it or beat it off...."
The defendant denied ever talking to Andrew Daigle about purchasing twin motors. The defendant said he had a twenty-two foot boat that he indicated had been abandoned after Hurricane Katrina and was given to him, but that he gave it away because he could not get "papers" on it. He gave the boat to Manny Taylor, the person who was in his truck when Deputy Smith came to talk to him about the motor theft on the day he helped Daigle and Nortel Williams move it. The defendant recalled that the boat had a one hundred seventy-five horsepower motor on it at one time, but that he did not get a motor when he acquired the boat.
The defendant concluded his testimony on redirect examination. He reiterated that he did not steal the motor nor did he did know the motor had been stolen. He said he was doing a good deed for Daigle, and got paid fifty ($50.00) dollars for it.

ERRORS PATENT
In accordance with La. C. Cr. P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one patent sentencing error.
As noted above the defendant was tried by a six-person jury on April 1-2, 2008, and found guilty of attempted theft of property valued at five hundred ($500.00) dollars or more. On May 21, 2008, the trial court sentenced the defendant to one year in Parish Prison, suspended pursuant to La. C. Cr. P. art. 894; two years misdemeanor active probation, with one hundred hours community service. The trial court also ordered as a special condition of his probation, the defendant pay restitution to the victim in the amount of the victim's insurance deductible, two thousand five hundred dollars ($2,500.00), through the District Attorney's Office, with the balance of the restitution, thirty-six thousand, fifty-three dollars and ninety-one cents ($36,053.91) to be paid to the victim's insurer.
The trial court's order that the defendant pay restitution to the victim's insurer is as a special condition of probation is contrary to the law. La. C. Cr. P. art. 895.1 provides:
A. (1) When a court places the defendant on probation, it shall, as a condition of probation, order the payment of restitution in cases where the victim or his family has suffered any direct loss of actual cash, any monetary loss pursuant to damage to or loss of property, or medical expense. The court shall order restitution in a reasonable sum not to exceed the actual pecuniary loss to the *222 victim in an amount certain. However, any additional or other damages sought by the victim and available under the law shall be pursued in an action separate from the establishment of the restitution order as a civil money judgment provided for in Subparagraph (2) of this Paragraph. The restitution payment shall be made, in discretion of the court, either in a lump sum or in monthly installments based on the earning capacity and assets of the defendant.
(2)(a) The order to pay restitution together with any order to pay costs or fines, as provided in this Article, is deemed a civil money judgment in favor of the person to whom restitution, costs, or fines is owed, if the defendant is informed of his right to have a judicial determination of the amount and is provided with a hearing, waived a hearing, or stipulated to the amount of the restitution, cost, or fine ordered. In addition to proceedings had by the court which orders the restitution, cost, or fine, the judgment may be enforced in the same manner as a money judgment in a civil case. Likewise, the judgment may be filed as a lien as provided by law for judgment creditors. Prior to the enforcement of the restitution order, or order for costs or fines, the defendant shall be notified of his right to have a judicial determination of the amount of restitution, cost, or fine. Such notice shall be served personally by the district attorney's office of the respective judicial district in which the restitution, cost, or fine is ordered.
Based on the facts of this case, the insurance company was not the victim of the crime as envisioned by the legislature. The insurer's involvement in this matter was based solely on a contractual obligation between the insured and the insurer. The insurance company was merely fulfilling a contractual obligation to indemnify the insured for his loss and as such is not the functional equivalent of a victim pursuant to article 895.1. Therefore, it can be concluded that the insurance company is an indirect third party to the crime. By application, restitution schemes necessarily entail complicated civil liability analysis which would be better resolved in other judicial arenas. Therefore, civil liability cannot be a function of restitution in criminal matters. As such, the insurance company must pursue a separate civil remedy.
We come to this conclusion with supporting jurisprudence from both the Third Circuit and the Fifth Circuit Courts of Appeal, which espouse the premise that restitution to the victim's insurance company is contrary to the law.
This theory's genesis begins primarily with the Louisiana Supreme Court in State v. Diaz, 615 So.2d 1336, 1337 (La.1993), where we find the initial guidance to ferret out this issue of payment of restitution. The Court outlined the legal interpretation of art. 895.1 as follows:
La.Code Crim.Proc. art. 895.1 A authorizes the court, when the victim has suffered any "monetary loss or medical expense," to order payment of restitution "in a reasonable sum not to exceed the actual pecuniary loss to the victim." (emphasis added). La.Code Crim.Proc. art. 895.1 B further authorizes the court to order payment "to the victim to compensate him for his loss and inconvenience," which amount may be in addition to the amounts ordered under Article 895.1 A. These articles focus primarily on restitution for pecuniary losses caused by the criminal activity and not on providing criminal sanctions to enforce collection of civil damages (including non-pecuniary damages). On resentencing the judge should determine a *223 specific (or determinable) reasonable amount of restitution, and should order payment "either in a lump sum or in monthly installments based on the earning capacity and assets of the defendant." La.Code Crim.Proc. art. 895.1 A.
The issue has evolved further in a recent criminal matter from Fifth Circuit Court of Appeal in State v. Devare, 03-610, p. 6 (La.App. 5 Cir. 10/28/03), 860 So.2d 191. The facts of the case are immaterial; what is important are the conditions of probation imposed by the district court. The district court in Devare ordered the defendant, as special conditions of probation, to pay a fine of $500.00, reimbursement to the Indigent Defender Board in the amount of $250.00, probation fees of $55.00 per month, $200.50 in court costs, and restitution in the amount of $12,005.44, subject to credit for payments that the defendant had already made. The court set the defendant's payments at $350.00 per month, payable over three years. Immediately thereafter, the prosecutor stated that the victim's insurance company had paid $11,804.25 to the victim and was seeking reimbursement. The court then ordered the defendant to reimburse the victim's insurance company in the foregoing amount and pay the balance of the restitution to the victim. The appellate court followed the initial analysis of art. 895.1 as noted in the above Louisiana Supreme Court per curiam in State v. Diaz. The Fifth Circuit noted in its analysis as follows:
The thrust of the defendant's argument is that restitution is an illegal condition of probation because the victim has been compensated for the stolen money. In State in the Interest of R.L.K, 95-1277 (La.App. 1 Cir. 12/19/95), 666 So.2d 427, writ denied, 95-3120 (La.1/26/96), 666 So.2d 1084, the delinquent child asserted that his disposition was improper for a number of reasons, including that the trial court had failed to consider the possibility that the victim had been reimbursed by insurance or by a restitution order against the co-perpetrator and failed to consider the child's ability to pay the amount of restitution. The appellate court agreed with the child that the disposition was improper, vacated the disposition and remanded for the trial court to impose a new disposition. Although the disposition was vacated for reasons other than restitution, the appellate court instructed the trial court to determine the restitution amount at the new disposition hearing, "after first considering whether or not the victim otherwise has been compensated for the loss and considering the child's ability to pay any amount ordered." Id. at 432-433.
The defendant cites State v. Dauzat, 590 So.2d 768 (La.App. 3 Cir.1991), writ denied, 598 So.2d 355 (La.1992) and State v. Schmidt, 558 So.2d 255 (La.App. 5 Cir.1990) in support of her position. Although these cases are not exactly on point, they do provide some guidance. In State v. Dauzat, the trial court ordered the defendant, who was found guilty of theft over $500, to pay restitution minus payments made by the victim's insurance company. Because the trial court failed to specify the actual dollar amount of restitution, the Dauzat court vacated the sentence and remanded for resentencing for the trial judge to "determine the amount of money taken by the defendant which was not covered by insurance." State v. Dauzat, supra at 775. In State v. Schmidt, supra, this Court affirmed the defendant's sentence where the court ordered the defendant, who pled guilty to vehicular homicide, to pay $25,000 in restitution to the victim's family, subject to a $10,000 credit for proceeds paid by the defendant's insurance company.

*224 In the present case, the defendant asserts that the victim will receive double recovery if the restitution order is not vacated. The record reflects that the victim's insurance company reimbursed him in the amount of $10,804.25. The record further shows that the victim executed a release in favor of the insurance company in this amount and that the insurance company has asserted its rights of subrogation. Therefore, it appears that the victim will not receive double recovery, because the ultimate recipient of the restitution ordered by the court would be the insurance company, not the victim. However, because the caselaw and La. C. Cr. P. art. 895.1 indicate, that restitution may be ordered only to compensate the victim, not the victim's insurance company, we find that the trial judge should have credited the restitution order by the amount that the victim's insurance company reimbursed the victim.
Devare, 860 So.2d at 194-195.
In two more recent cases from the Third Circuit Court of Appeal, our brethren have further narrowed the analysis to preclude the criminal district courts from ordering restitution to the victims' insurance companies as a condition of probation, unless the insurance company is itself an actual victim to the crime.
In State v. Perez, 2007-229 (La.App. 3 Cir. 10/3/07), 966 So.2d 813, the district court had ordered, pursuant to a plea agreement on 10 counts of aggravated criminal damage to property[2], the defendant to pay restitution to the victims' insurance company. The defendant, in his plea agreement in accordance with State v. Crosby, 338 So.2d 584 (La.1976), reserved his right to appeal the issue of payment of restitution to the victims' insurance companies, should that condition be part of his sentence. On appeal, the Third Circuit followed the holding in Devare and held that the defendant should be ordered to pay restitution to his victims only.
Finally, in State v. Smith, XXXX-XXXX (La.App. 3 Cir. 3/4/09), 6 So.3d 309, the defendant pled guilty to theft of over $500.00 and attempted theft of a firearm. As one of the special conditions of probation the defendant was ordered to pay restitution in the amount of $781.56, to the insurance company, the amount paid to the victim pursuant to an insurance claim. The Smith court held that the defendant could not be ordered to pay restitution to the victims' insurers, which had paid the victims for theft of their property committed by defendant; restitution could be ordered only to compensate the victim, not insurance company. Notably, the Smith court recognized that applicable jurisprudence offers no supporting evidence on the issue of whether the insurance companies are victims.
Based on what may be considered a trend among the Circuits, we can only conclude that without supporting evidence that the insurance company is the direct victim of the crime, restitution as a condition of probation is verboten. Following applicable jurisprudence we find that the district court erred in ordering the defendant to pay restitution to the victim's insurance company. Accordingly, we remand the matter for a resentencing consistent with this opinion.

ASSIGNMENT OF ERROR NO. 1
In this first assignment of error the defendant argues that because he was only convicted of attempted theft, the district court erred in ordering him to pay restitution for the value of property he did not *225 steal. The defendant filed a motion to reconsider sentence alleging excessiveness and that the sentence was not in conformity with the offense for which he was convicted. This latter ground preserved the issue as to restitution for review.
In sentencing the defendant the district court required the defendant to make restitution in the amount of thirty-eight thousand five hundred fifty-three dollars and ninety-one cents ($38,553.91). Twenty-five hundred ($2,500.00) dollars was to be paid to the victim, C & M Contractors, and the balance thirty-six thousand, fifty-three dollars and ninety-one cents ($36,053.91) to C & M's insurer, Travelers Insurance Company.
The defendant cites no authority for the proposition that because he was only convicted of attempted theft, he cannot be sentenced to pay restitution for the value of something he did not steal Instead, he makes a common-sense type of argument that a sentence requiring payment of restitution for stolen property could only be justified upon a conviction for the actual crime of theft.
La. R.S. 14:67 proscribes the crime of theft, and states in pertinent part:
(A) Theft is the misappropriation or taking of anything of value which belongs to another, either without the, consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
La. R.S. 14:27 sets forth the law as to attempted offenses, and states in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
* * *
C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.
A person who has the specific intent to commit a theft and who does or omits an act for the purpose of accomplishing the theft is guilty of an attempt to commit the offense intended, and it is immaterial whether under the circumstances he would have actually accomplished his purpose. State v. Pittman, 368 So.2d 708, 710 (La.1979).
Under La. R.S. 14:27(A) and R.S. 14:67(A), a defendant convicted of attempted theft has been convicted of a crime in which a completed theft was not necessarily accomplished.
In the instant case, all the evidence was that a theft occurred, given that the outboard motor was never recovered. Nevertheless, the defendant was not convicted of theft.
Restitution is provided for by three articles in the Louisiana Criminal Code and one statute.
La. C. Cr. P. art. 895 provides in pertinent part:
A. When the court places a defendant on probation, it shall require the defendant to refrain from criminal conduct and to pay a supervision fee to defray the costs of probation supervision, *226 and it may impose any specific conditions reasonably related to his rehabilitation, including any of the following. That the defendant shall:
* * *
(7) Make reasonable reparation or restitution to the aggrieved party for damage or loss caused by his offense in an amount to be determined by the court; ...
La. C. Cr. P. art. 895.1 states in pertinent part:
A. (1) When a court places the defendant on probation, it shall, as a condition of probation, order the payment of restitution in cases where the victim or his family has suffered any direct loss of actual cash, any monetary loss pursuant to damage to or loss of property, or medical expense. The court shall order restitution in a reasonable sum not to exceed the actual pecuniary loss to the victim in an amount certain. However, any additional or other damages sought by the victim and available under the law shall be pursued in an action separate from the establishment of the restitution order as a civil money judgment provided for in Subparagraph (2) of this Paragraph. The restitution payment shall be made, in [sic] discretion of the court, either in a lump sum or in monthly installments based on the earning capacity and assets of the defendant.
* * *
B. When a court suspends the imposition or the execution of a sentence and places the defendant on probation, it may in its discretion, order placed, as a condition of probation, an amount of money to be paid by the defendant to any or all of the following:
* * *
(5) To the victim to compensate him for his loss and inconvenience. Such an amount may be in addition to any amounts ordered to be paid by the defendant under Paragraph A herein.
The restitution provided for in La. C. Cr. P. art. 895(A)(7) and La. C. Cr. P. art. 895.1 are both conditioned on the defendant receiving probation, which defendant in the instant case did. Two other provisions provide for restitution aside from whether or not the defendant receives probation, La. C. Cr. P. art. 883.2(A)[3] and La. R.S. 46:1844(M).[4]
In the instant case, the district court expressly ordered the defendant to pay restitution as a condition of his probation. The district court cited La. C. Cr. P. art. 895 and La. C. Cr. P. art. 895.1 in its reasons for denying defendant's motion to reconsider sentence. La. C. Cr. P. art. *227 895 and C. Cr. P. art. 895.1 expressly provide for restitution as a condition of probation when a defendant is placed on probation. La. C. Cr. P. art. 883.2 refers to restitution being ordered by the trial court "as a part of any sentence that the court shall impose," and does not mention probation at all. La. R.S. 46:1844 does not condition restitution on probation, nor does it exclude the possibility of restitution being required as a condition of probation.
Because the district court in the instant case expressly relied upon La. C. Cr. P. art. 895 and La. C. Cr. P. art. 895.1 in imposing the condition of restitution, those provisions govern in the instant case.[5]
A trial court has vast discretion in sentencing decisions, including the ordering of restitution. State v. Coward, XXXX-XXXX, p. 7 (La.App. 3 Cir. 10/3/07), 967 So.2d 580, 585; State v. Williamson, XXXX-XXXX, p. 6 (La.App. 3 Cir. 3/2/05), 896 So.2d 302, 307.
The following three decisions by the Louisiana Supreme Court have addressed restitution under La. C. Cr. P. art. 895 and/or La. C. Cr. P. art. 895.1, and all three were cited by this court in State v. Francois, 548 So.2d 1284 (La.App. 4 Cir. 1989), the only decision by this court addressing the issue presented by defendant herein.
In State v. Labure, 427 So.2d 855 (La. 1983), the defendant and two codefendants were charged with simple burglary of the residence of Bobby Benson. The defendant had also been charged with illegal possession of stolen things valued at over five hundred ($500.00) dollars and two counts of theft of over one hundred ($100.00) dollars in connection with a burglary of the residence of Ira Love. In return for the defendant's plea of guilty to the Benson burglary, the charges associated with the Love crime were dismissed. The defendant received a suspended sentence and was placed on probation. Two conditions of probation were that he pay restitution to Bobby Benson and to Ira Love. On the defendant's appeal of his sentence as unconstitutionally excessive, the court noted as an error patent the condition of probation that he pay restitution to Ira Love. The court cited La. C. Cr. P. art. 895.1(A), referring to restitution to the "victim," and La. C. Cr. P. art. 895(A)(7), referring to restitution to the "aggrieved party." The court stated that since Ira Love was not an "aggrieved party" or a "victim" in connection with the offense to which the defendant had pleaded guilty, restitution to Ira Love could not be required as a condition of the defendant's probation. The court characterized the restitution condition and an unreasonable curfew condition of the defendant's probation as illegal and set aside the sentence.
In State v. Alleman, 439 So.2d 418 (1983), the defendant pleaded guilty to making three obscene telephone calls, and in the plea bargain the State dismissed two additional counts of the same offense. The trial court sentenced the defendant to imprisonment, suspended the sentence, and placed the defendant on probation. As a condition of probation, the trial court ordered the defendant to pay restitution to all the victims of the five offenses, including the two victims of the offenses for which he was not convicted. On appeal, the defendant argued, inter alia, that the *228 trial court had erred requiring him to pay restitution for two offenses for which he had not been convicted. The Louisiana Supreme Court found that the restitution condition as to the two offenses for which defendant was not convicted was invalid, stating:
The sentencing judge is expressly authorized to require the condition of "restitution to the aggrieved party for damage or loss caused by his offense," La. C. Cr. P. art. 895(A)(7) (Emphasis in original). Consequently, this court has held that restitution to the victim of a crime of which the defendant was not convicted or did not plead guilty may not be imposed. State v. Labure, 427 So.2d 855 (La.1983).
Alleman, 439 So.2d at 419.
In State v. Elkins, 489 So.2d 232 (La. 1986), the defendant was charged with one count of receiving stolen jewelry in the amount of two hundred ($200.00) dollars and one count of receiving stolen jewelry in the amount of five hundred ($500.00) dollars. The jewelry had been stolen in burglaries of the homes of C. Niehouse and L. Eaton, the latter victim whose door was broken down. The defendant pleaded guilty as charged and received two concurrent sentences of imprisonment, which were suspended. The defendant was placed on probation, a condition of which was that he pay restitution to Eaton and pay restitution to Niehouse. In determining the amounts owed the burglary victims, the sentencing court relied on: (1) the presentence investigation report, which reflected that both victims "thought" the defendant had participated in the burglaries; and (2) the defendant's own indication that the presentence investigation report was "accurate and correct." Elkins, 489 So.2d at 233.
The defendant in Elkins appealed, arguing that the restitution condition exceeded the authority of the sentencing judge under La. C. Cr. P. art. 895(A)(7) and La. C. Cr. P. art. 895.1(A). The appellate court affirmed the sentence in State v. Elkins, 478 So.2d 1264 (La.App. 5 Cir. 1985), finding a sufficient relationship between the offenses to which the defendant pleaded guilty and the losses suffered by the victims so as to justify the order of restitution.
On grant of certiorari in Elkins, the Louisiana Supreme Court cited its prior decisions in Labure, supra and Alleman, supra, and noted that the defendant in Elkins was incriminated in the burglaries only by the victims' suppositions. The court further noted that under the circumstances the defendant's statement that the presentence investigation report was accurate could not be equated with a plea to charges she never faced. The court found that the record was barren of evidence of the actual damage to the victims, of whether the stolen jewelry had been returned, or of the defendant's participation in the burglaries. In conclusion, the court stated:
Assuming the condition of restitution ordered in this case is not otherwise invalid under Alleman, we hold that restitution is improper absent proof of a defendant's participation in the crime for which restitution is sought. (Emphasis added).
Elkins, 489 So.2d at 233.
Given this emphasized language in Elkins, it might be argued that the Louisiana Supreme Court approved of requiring a defendant to pay restitution upon proof of a defendant's "participation in the crime for which restitution is sought." However, it could be argued that such a holding would be contrary to the court's prior holdings in Labure and Alleman.
In State v. Francois, 548 So.2d 1284 (La.App. 4 Cir.1989), this court examined *229 Labure, Alleman and Elkins before concluding that a defendant charged with possession of stolen things valued at two thousand ($2,000.00) dollars, but convicted of possession of stolen things valued at less than one hundred ($100.00) dollars, could not be required to pay restitution in the amount of two thousand five hundred ($2,500.00) dollars.
The facts of Francois were somewhat similar to those in the instant case insofar as there being some evidence of the defendant's guilt of the greater offense charged. In Francois, a police officer responding to a report of an automobile being stripped in the Lower Ninth Ward followed a trail of oil from the defendant's driveway and found a stripped stolen automobile a block away. The owner of a nearby tow truck told police he loaned the defendant his tow truck at approximately 5:00-5:30 p.m. that day to lift and work on a white Oldsmobile. As the officer was talking with that witness, the defendant came onto the scene. The officer and the two men then returned to the defendant's residence. The officer noticed the defendant had fresh motor oil on his clothes and observed parts from the stolen white Oldsmobile scattered about the defendant's yard. Other parts were found in the defendant's shed, and the license plate from the stolen car was found burning in a barrel on the defendant's property.
The defendant in Francois told the investigating officer he had purchased the tires and battery from Western Auto, although the items were not Western Auto brand. The defendant told the officer someone named "Keith" had put the auto on his property, but also told the officer that he would reveal the location of motor and transmission after he was released. The defendant testified at his trial that he had worked all day, then gone to a friend's home in Chalmette to work on the friend's vehicle until 10:00 p.m. He said the auto parts were in his yard when he came home that night. The defendant's friend basically corroborated that story. The defendant's wife also corroborated his story, testifying that "Keith" was at their house about 5:00 p.m. that day because she and the defendant had used Keith's truck that day.
Upon the Francois defendant's conviction for possession of stolen things valued at under one hundred ($100.00) dollars, he received a suspended sentence and probation. One condition of the defendant's probation was that he pay restitution in the amount of two thousand five hundred ($2,500.00) dollars to the victim whose Oldsmobile was stolen and stripped of parts the defendant was found guilty of possessing. The defendant appealed to this court, urging as his sole assignment of error that the trial court erred in requiring him to pay two thousand five hundred ($2,500.00) dollars in restitution.
In reviewing that assignment of error in Francois, this court reviewed and thoroughly discussed Labure, Alleman and Elkins. This court first noted that the defendant had never been charged with theft of the auto. The court then noted that although the defendant had been charged with possession of stolen things valued at two thousand ($2,000.00) dollars, the restitution required payment of two thousand five hundred ($2,500.00) dollars. This court further noted that "[i]mportantly," the defendant was convicted of possession of stolen things valued at under one hundred ($100.00) dollars. Francois, 548 So.2d at 1287. This Court noted that there was nothing in the record as to the value of the car except the approximate purchase price paid by the victim several years earlier for the then new car, or any evidence whether the victim received any *230 of his auto parts back. In conclusion, this court simply stated:
The defendant was convicted of possession of stolen things valued at less than $100. The defendant cannot be ordered to make restitution of $2,500 as a result of the conviction. The defendant's sentence is vacated and the case is remanded for resentencing.
Francois, 548 So.2d at 1287.
Francois is distinguishable from the instant case because the defendant was ordered to pay restitution in an amount greater than the amount of the crime for which he was convicted. In the instant case, defendant was convicted of the attempted theft of property valued at five hundred ($500.00) dollars or more. Thus, any restitution in defendant's case could not have been limited to less than a particular amount, as it was in Francois. In addition, the amount of restitution ordered was supported by evidence, unlike in Francois.[6]
Defendant's case is also distinguishable from Labure, Alleman and Elkins in that, insofar as the boat motor, he is not being ordered to pay restitution in connection with a crime he did not commit. He is being ordered to pay restitution in connection with a crime he did commit.
In sentencing the defendant, the trial court said it was perplexed and had no idea why the jury made the decision to find defendant guilty of the lesser included offense of attempted theft. La. R.S. 14:27(C) states that a defendant "may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt." In ordering defendant to pay restitution, the trial court acted within its discretion under La. C. Cr. P. arts. 895 and 895.1 to order defendant to pay full restitution to the victim. As noted above in errors patent the district court erred in ordering the defendant to pay restitution to the victim's insurance company. Otherwise there is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
In the second of his two assignments of error, defendant mistakenly cites La. R.S. 14:27(D)(3) for the proposition that since he was convicted of attempted theft, the maximum amount of restitution the trial court could have required him to pay was one-half of the total amount of the loss.
La. R.S. 14:27 is the attempt statute. La. R.S. 14:27(D) states:
D. Whoever attempts to commit any crime shall be punished as follows:
(1)(a) If the offense so attempted is punishable by death or life imprisonment, *231 he shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence.
(b) If the offense so attempted is punishable by death or life imprisonment and is attempted against an individual who is a peace officer engaged in the performance of his lawful duty, he shall be imprisoned at hard labor for not less than twenty nor more than fifty years without benefit of parole, probation, or suspension of sentence.
(2) If the offense so attempted is theft or receiving stolen things, and is not punishable as a felony, he shall be fined not more than two hundred dollars, or imprisoned for not more than six months, or both. If the offense so attempted is receiving stolen things, and is punishable as a felony, he shall be fined not more than two hundred dollars, or imprisoned not more than one year, or both. If the offense so attempted is theft, and is punishable as a felony, he shall be fined not more than five hundred dollars, or imprisoned not more than one year, or both;
(3) In all other cases he shall be fined or imprisoned or both, in the same manner as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both. (Emphasis added).
La. R.S. 14:27(D)(3), cited by defendant, does not apply to attempted thefts because La. R.S. 14:27(D)(2) expressly does. La. R.S. 14:27(D)(3) applies to "all other cases," meaning all those cases not covered by La. R.S. 14:27(D)(1) and (2). Further, La. La. R.S. 14:27(D)(2) and La. R.S. 14:27(D)(3) refer only to terms of imprisonment and fines, and make no mention of restitution.
There is no merit to this assignment of error.
For the foregoing reasons, we affirm the defendant's conviction. However, we vacate the district court's order that the defendant pay restitution to the victim's insurance company. Accordingly, we remand the matter to the district court for resentencing consistent with this opinion.
CONVICTION AFFIRMED; REMANDED FOR RESENTENCING.
BONIN J., concurs with reasons.
BONIN, J., concurs with reasons.
I respectfully concur with the affirmation of the conviction and the remand for resentencing in this misdemeanor case. However, I write separately to emphasize certain aspects of this case, especially since we are remanding for sentencing to a different trial judge than the one who imposed the original sentence.
The trial court on remand, it is important to note, is not bound to impose the same sentence previously imposed nor is it obliged to reimpose the condition of probation which the majority opinion rules has survived. La. C. Cr. P. art. 881.1(A)(2) provides:
In misdemeanor cases, the defendant may file a motion to reconsider sentence at any time following commencement or execution of such sentence. The court may grant the motion and amend the sentence, even following completion of execution of the sentence, to impose a lesser sentence which could lawfully have been imposed.
Moreover, "[t]he court may suspend, reduce, or amend a misdemeanor sentence after the defendant has begun to serve the sentence." La. C. Cr. P. art. 894(A)(4). Therefore, on remand for resentencing the *232 trial judge is free to impose "a lesser sentence."
Because a victim's right to seek restitution is protected by La. Const. art. I, § 25, and La. R.S. 46:1844, the trial court on remand may consider the appropriateness of an order of restitution as a condition to probation. La. C. Cr. P. art. 883.2. However, in the event that restitution to the victim is ordered, the sentencing judge should consider and clarify any requirements of La. C. Cr. P. art. 895.1(A)(1) in determining the actual loss to the victim as well as in specifying how the payments shall be made, State v. Stewart, 92-0071, p. 2 (La.App. 4 Cir. 9/17/92), 605 So.2d 648, 650, "either in a lump sum or in monthly installments based on the earning capacity and assets of the defendant." State v. Diaz, 93-0357 (La.4/2/93), 615 So.2d 1336, 1337.
Ordering victim restitution, even as a condition of probation, is problematic under the facts, of this case. Although charged with a felony theft over five hundred dollars, a violation La. R.S. 14:67(B), the defendant was only convicted of the misdemeanor offense of attempted theft over five hundred dollars, punishable under La. R.S. 14:27(D)(2). The defense has argued on appeal for application of a per se rule that because he was convicted of an attempted theft, he cannot be compelled to pay restitution for the object of a completed theft. While his position may be arguable under Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), as an intermediate appellate court we are bound to apply the Louisiana Supreme Court's holding in State v. McGloster, 303 So.2d 739 (La.1974) in affirming the imposition of the condition of payment of restitution. In McGloster, the defendant was convicted of the attempted unauthorized use of a credit card, and his one-year sentence was suspended on the condition that restitution be made. The defendant asserted that requiring restitution for the attempted unauthorized use of a credit card was illegal. The court disagreed, finding that La. C. Cr. P. art. 895(A)(7) authorizes a trial court to require a defendant as a condition of probation to make reasonable restitution to the aggrieved parties for any loss caused by the offense. McGloster, 303 So.2d at 739. However, the trial court on remand is afforded the discretion to revisit the defendant's Blakely argument and, in light thereof, decide anew whether restitution is appropriate in light of the jury's acquittal of the defendant for the completed offense.
NOTES
[1] La. R.S. 14:67(B)(1) proscribes theft of anything of value where the value amounts to five hundred dollars or more. The jury was charged with this offense, and the jury returned a verdict of guilty of attempted theft of property having, a value of five hundred dollars or more. It is obvious that "theft over $500" as stated in the bill of information is simply shorthand for theft of anything of value where the value amounts to five hundred dollars or more.
[2] The defendant had originally been charged with over 60 counts of criminal damage but plea bargained to entering pleas of guilty to 10 counts.
[3] La. C. Cr. P. art. 883.2 states in pertinent part:

A. In all cases in which the court finds an actual pecuniary loss to a victim, or in any case where the court finds that costs have been incurred by the victim in connection with a criminal prosecution, the trial court shall order the defendant to provide restitution to the victim as a part of any sentence that the court shall impose.
[4] La. R.S. 46:1844, providing for the rights of crime victims and witnesses, provides in pertinent part:

M. Victims' right to seek restitution.
(1) If the defendant is found guilty, the court or parole board shall require the defendant to pay restitution to the appropriate party in an amount and manner determined by the court. In addition, the court or parole board may require the defendant to perform community service work in an amount and according to a schedule determined by the court.
[5] In sentencing defendant the trial court advised him that pursuant to La. C. Cr. P. art. 886 and C. Cr. P. art. 886.1, if restitution had not been made the court would sign a civil judgment in the amount of the restitution, and the judgment would begin to accrue interest. La. C. Cr. P. art. 886 and C. Cr. P. art. 886.1 say nothing about being limited in application to restitution ordered pursuant to any particular provision.
[6] The sentencing transcript reflects that the total amount of restitution ordered by the trial court included not only the cost of the stolen outboard motor, which was never recovered, which amounted to seventeen thousand one hundred fifty ($17,150.00) dollars, but also consequential damages to the radar, GPS, VHS, depth sounder and cables connecting it, amounting to six thousand thirteen dollars and eighty-three cents ($6,013.83); parts and labor to repair the remaining motor as a result of the theft/attempted theft of the other motor, amounting to seven thousand four hundred forty-eight dollars and twenty-two cents ($7,448.22); the cost of towing the ST. JUDE after it was recovered in the Mississippi River, amounting to four thousand seven hundred sixty ($4,760.00) dollars; the cost to the victim for use of a vessel to replace the ST. JUDE while it was being repaired, amounting to one thousand four hundred ($1,400.00) dollars; and some incidental costs for lost fuel and three boat batteries.

It is to be noted that defendant does not break down the restitution order into elements of damages, nor does he argue that any particular amount of restitution ordered is inappropriate insofar as what it is intended to compensate the victim and/or his insurer for.